# In the United States Court of Federal Claims

No. 17-1543C

(Filed Under Seal: February 22, 2018)

(Reissued: February 28, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **HARMONIA HOLDINGS GROUP, LLC,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **UNITED STATES,** ) <br> ) <br> **Defendant** ) <br> ) <br> **and** ) <br> ) <br> **OST, INC.,** ) <br> ) <br> **Defendant-Intervenor.** ) <br> ) <br> ) | Post-award bid protest; procurement under the Federal Supply Schedule, governed by FAR Subpart 8.4; best value award |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Gregory R. Hallmark, Holland & Knight, LLP, Tysons, Virginia, for plaintiff.  Of counsel was Elizabeth N. Jochum, Holland & Knight, LLP, McLean, Virginia.

Isaac B. Rosenberg, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C.  Of counsel were Stephen F. Pereira and Mark D. Montgomery, Attorney-Advisors, Office of Chief Counsel, Federal Transit Administration, United States Department of Transportation.

Thomas A. Coulter, LeClairRyan, PC, Richmond, Virginia, for defendant-intervenor. Of counsel was Nicole Hardin Brakstad, LeClairRyan, PC, Richmond, Virginia.

## OPINION AND ORDER[1]

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  The parties disagreed about the need for redactions, but

LETTOW, Judge.

Plaintiff, Harmonia Holdings Group, LLC, brings this post-award bid protest to challenge the Federal Transit Administration's ("FTA" or "the Agency") repeated determination that Optimal Solutions and Technologies, Inc.'s ("OST") proposals offered better value to the Agency than did Harmonia's proposals.  Harmonia and OST were among five bidders for an information technology service contract; the bidders were evaluated on their technical proposals and price quotations to determine which provided the best value to FTA.  Of the two, Harmonia submitted the less expensive quotation but OST's proposal received a higher technical rating. The Agency determined that OST, despite its relatively higher price, provided the best value and awarded OST the contract in July 2016.  OST began to perform the contract and a series of protests ensued.  Harmonia protested the award before the Government Accountability Office ("GAO"), which sustained the protest.  A reevaluation occurred and OST again prevailed. Harmonia then filed two protests with this court, both of which were eventually dismissed as moot based on further corrective action, and an agency protest also was filed.  The result of FTA's latest corrective action, confirming the award to OST, is the subject of this bid protest. Thus, a total of five different protests have been filed respecting FTA's procurement. Throughout the process, OST has continued to perform the originally awarded contract.

In conjunction with the most recent corrective action, FTA invited Harmonia and OST to submit revised price quotations, and both did so.  Once again, OST's quotation was the more expensive of the two.  FTA also performed new technical evaluations and even though OST's and Harmonia's proposals both received lower ratings than before, Harmonia again received the lower technical score.  With these revised results, FTA determined that OST still represented the best value.  Harmonia filed a complaint in this court on October 17, 2017 and then moved for judgment on the administrative record on November 22, 2017.  The record was corrected after that motion was filed, and the subsequent briefing takes account of the corrected record.[2]

Harmonia challenges FTA's decision on numerous grounds and seeks a permanent injunction setting aside the contract award to OST and requiring FTA to reevaluate Harmonia's and OST's proposals.  The government and OST have opposed that motion and filed cross-motions for judgment on the administrative record.

## FACTS[3]

---

the court has resolved the disparity.  The resulting redactions are shown by brackets enclosing asterisks, *e.g.*, "[***]."

[2]Citations to the administrative record refer to the record as filed on November 1, 2017 and corrected with additions on December 13, 2017.  The record is divided into tabs and paginated sequentially.  In citing to the record, the court will first designate the tab, followed by the page number.  For example, AR 3-4 refers to tab 3 page 4 of the administrative record.

[3]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir.

On March 8, 2016, FTA, an "operating administration . . . within the U.S. Department of Transportation," issued a request for quotations, No. DTFT6016Q00004 ("the RFQ" or "the solicitation") for a multi-year information technology services contract. *See* AR 3-4 to -98; Def.'s Cross-Mot. for Judgment on the Administrative Record and Opp'n to Pl.'s Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 3, ECF No. 25. The RFQ was issued under the Federal Supply Schedule procedures of Subpart 8.4 of the Federal Acquisition Regulations ("FAR"), 48 C.F.R. Subpart 8.4, relating to the General Services Administration's ("GSA") Schedule 70 Contracts. *See* Def.'s Cross-Mot. at 3. The RFQ required that all proposals from prospective bidders include a technical proposal and a price quotation. *See* AR 3-59. The RFQ identified eleven contract line item numbers ("CLIN") that corresponded to specific tasks and responsibilities that an awardee of the contract would be required to undertake. *See* AR 3-15 to -28. All submitted proposals were to be evaluated using the best-value-tradeoff evaluation method, with the technical proposals being evaluated for "technical capabilities," "qualification of proposed personnel," and "proven corporate experience." *See* AR 3-60 to -62. The RFQ listed 147 individual technical criteria, covering each of the three evaluation categories for both "[g]eneral [r]equirements" and individual CLINs. AR 3-66 to -98. The technical proposals were to be evaluated according to the statement of work provided for each criterion, *see* AR 3-65 to -98, and then assigned a numerical score between 1 and 100, corresponding to an adjectival rating of outstanding, good, average, and so forth, AR 3-62 to -63. The price quotations were to be evaluated for realism, clear understanding, inclusivity, price inconsistencies, and unbalanced pricing. *See* AR 3-63. The Agency also "reserve[d] the right to obtain information on [the bidders'] past performance from any sources" and indicated that no points would be associated with the evaluation of such information. AR 3-64.

Harmonia, a Virginia-based, limited liability company, Am. Compl. ¶ 5,[4] was one of five bidders to submit proposals. AR 31-1113. Harmonia received the second highest technical rating with a score of 85.83, corresponding to a "good" adjectival rating, and provided the second lowest price quotation. *Id.* On July 15, 2016, FTA awarded the contract to OST, AR 33-1119, who had received the highest technical rating—91.79, an "outstanding" adjectival rating— but who had proffered the most expensive price quotation. *See* AR 3-62; 31-1113. FTA determined that OST provided the best value to the Agency despite its relatively high price quote because "OST [was] highly technically capable with insignificant weaknesses," while Harmonia "ha[d] weaknesses which [could] yield unfavorable results impacting the overall . . . contract." AR 31-1115.

Harmonia protested the Agency's award before GAO on July 27, 2016, asserting that FTA had unreasonably assigned numerous weaknesses to Harmonia's technical proposal, had unreasonably credited OST with satisfying technical criterion 126 in the Agency's technical evaluation, had failed to conduct a best-value-tradeoff analysis, and had failed to reject OST's proposal for including allegedly improper assumptions. *See* Am. Compl. ¶¶ 28, 30; Def.'s Cross-Mot. at 6-7. GAO sustained Harmonia's protest as to the best-value-tradeoff analysis and

---

2005) (explaining that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[4]All citations to the complaint in this bid protest refer to the Amended Complaint, ECF No. 23-1, filed November 27, 2017.

criterion 126; GAO recommended "that the FTA perform and document a price/technical tradeoff analysis" and re-award the contract, *vel non*, accordingly.  *See* AR 46-2201 to -2204.[5] As to Harmonia's remaining allegations of FTA misconduct, GAO determined that "none provide[d] a basis to sustain the protest."  AR 46-2197 & n.5.

FTA permitted OST to perform the contract both through the pendency of the GAO protest and during the subsequent corrective action period.  Am. Compl. ¶¶ 31, 35.  When FTA failed to take corrective action within that 60-day period, Harmonia contacted the agency, which indicated that it was "planning to announce the results by mid-February."  Am. Compl. ¶¶ 38, 40. When the agency still failed to take any action, Harmonia filed a complaint with this court on April 14, 2017, seeking to enjoin OST's continued performance absent a best-value-tradeoff determination from FTA.  *See* Compl. in Case No. 17-532.  Shortly thereafter, on April 26, 2017, FTA notified both Harmonia and OST that the Agency had completed its revaluation process and had reaffirmed its decision to award the contract to OST.  AR 57-2393 to 58-2394; *see also* AR 56-2392.  In light of FTA's corrective action, this court dismissed Harmonia's protest as moot. *See* Def.'s Cross-Mot. at 9.

On May 9, 2017, Harmonia again filed a bid protest in this court, this time challenging the substance of the Agency's corrective action.  *See* Compl. in Case No. 17-624.  Harmonia claimed that FTA had "failed to conduct a meaningful tradeoff analysis," had "conducted an erroneous price evaluation of Harmonia's [q]uotation," and had, again, failed to properly account for OST's allegedly objectionable inclusion of assumptions in its proposal.  *See* Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Mot.") at 7, ¶ 21, 23, ECF No. 22; Def.'s Cross-Mot at 9.  On June 16, 2017, the Agency declared its intent to take further corrective action, specifically to "open discussions with all technically-acceptable bidders . . . limited strictly to their respective price proposals" and "re-evaluate any technical [proposals] that previously had been deemed acceptable but that FTA had not re-evaluated following . . . the GAO [decision]." AR 61-2403 to -2405.  This court then dismissed Harmonia's second protest as moot.  *See* Pl.'s Mot. at 7, ¶ 22; Def.'s Cross-Mot. at 9.  In the interim, on May 15, 2017, FTA exercised its first option year under the contract, extending OST's contract "for the period of . . . July 15, 2017 through July 14, 2018."  AR 60-2402.

---

[5]As counsel for the government advised:

> GAO did not sustain [the] protest on the merits of the tradeoff because it didn't have the tradeoff before it.  There was an inadvertent omission from the record before the GAO.  But there is a tradeoff.
>
> . . .
>
> [T]he procurement summary is a five-page document and the exhibits submitted at the GAO included pages 1, 2, 3, and 5.  The tradeoff was on page [4].  Certainly, it would . . . have been better . . . if that page had been included in the [summary] to begin with.

Hr'g Tr. 57:24 to 58:11.

As part of its further corrective action, the Agency invited Harmonia and OST to submit revised price quotations for the contract's remaining four option years. *See* AR 63-2410 to -2413. "[T]o level the playing field and eliminate any perceived advantages" OST might have gained via its incumbency, Harmonia requested answers to a series of detailed questions about FTA's expectations for the revised quotations. *See* AR 64-2414 to 65-2424, 75-2508 to -2512. In that connection, Harmonia filed an agency-level protest, AR 74a-2505 to -2507, which was resolved, AR 76-2513, by FTA's response to the questions, AR 71-2435 to -2437, 79-2520 to -2523. Both Harmonia and OST submitted revised price quotations; once again, OST's quotation was the higher of the two. AR 82-2541 to -2563, 84-2565 to -2584 (stating OST's estimated total price as $10,856,891.64 and Harmonia's as $9,118,306.24). The Agency also performed a new evaluation of the bidders' existing technical proposals. *See* AR 89-2626 to -2633. Both OST's and Harmonia's proposals received a lower rating in this round of evaluations; OST received an "outstanding" rating of 90.49 and Harmonia a "good" rating of 79.54. AR 89-2627. With the new price quotations and technical evaluations, the Agency performed another best-value-tradeoff analysis and once again determined that "OST . . . represent[ed] the best value proposal for the FTA." AR 91-2641 to -2642. Both Harmonia and OST were notified of the Agency's decision on September 22, 2017, AR 92-2643 to 93-2646, and Harmonia requested and, on October 3, received a debriefing of FTA's reasoning for its decision. *See* AR 95-2649 to -2653.

Harmonia filed the complaint in the instant bid protest on October 17, 2017. Harmonia challenges FTA's determination and award on numerous specific grounds but essentially contends that the Agency's price and technical evaluations were erroneous, that OST's assumptions regarding its price quotation "took exception to the material terms of the RFQ," rendering OST's proposal invalid, and that FTA's best-value determination was flawed. *See* Am. Compl. ¶¶ 82-149. Harmonia seeks a permanent injunction "setting aside the [contract] awarded to OST" and "requiring the FTA to reevaluate Harmonia's and OST's proposals in accordance with the RFQ and all applicable laws and regulations." Am. Compl. at 46.

Pending before the court is Harmonia's motion for judgment on the administrative record, *see generally* Pl.'s Mot., and the government's and OST's cross-motions. *See generally* Def.'s Cross-Mot.; Def.-Intervenor's Cross-Mot. for Judgment on the Administrative Record . . . and Response to Pl.'s Mot. for Judgment on the Administrative Record ("Def.-Intervenor's Cross-Mot."), ECF No. 26. All issues have been briefed and argued and are now ready for disposition.

## STANDARDS FOR DECISION[6]

---

[6]The court has jurisdiction over this bid protest under the Tucker Act as amended by the Administrative Dispute Resolution Act of 1996) ("ADRA"), Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870, 3874-75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)). Jurisdiction in this instance is not governed by what was 41 U.S.C. § 253j(e), now recodified as 41 U.S.C. § 4106(f), which states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for ---(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." *See Holloway & Co., LLC v. United States*, 87 Fed. Cl. 381, 390 & n.11 (2009) (citing *IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135-36 (2006) (concluding that the statutory

Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's consideration of a challenge to an agency's contract award. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, courts may set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), subject to the traditional balancing test applicable to a grant of equitable relief, *see PGBA, LLC v. United States*, 389 F.3d 1219, 1224-28 (Fed. Cir. 2004). The court may overturn an agency decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Because "[c]ontracting [o]fficers are entitled to exercise discretion upon a broad range of issues . . . , procurement decisions are subject to a highly deferential rational basis review." *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (internal citations and quotation marks omitted). "[T]he court must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *PAI Corp.*, 614 F.3d at 1351 (internal quotation marks and brackets omitted); *see also Innovative Test Asset Sols., LLC v. United States*, 125 Fed. Cl. 201, 215 (2016) (noting that the arbitrary and capricious standard is highly deferential, and the court may not "substitute its judgment for that of the agency" (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (internal quotation marks omitted).

## ANALYSIS

### A. FTA's Evaluation of Harmonia's Price Quotation

Harmonia contends that FTA arbitrarily and capriciously evaluated Harmonia's price quotation in its price realism assessment, erred in its finding that Harmonia's pricing was unbalanced, and mistakenly assessed Harmonia's approach to the deputy project manager position. *See* Pl.'s Mot. at 15-27. Because this was a simplified procurement under FAR Subpart 8.4, Harmonia must demonstrate that FTA's decision had no rational basis. "[A] procurement under [S]ubpart 8.4 is different in kind from one conducted under Part 15, even if some procedures also present in Part 15 are u[s]ed." *Holloway*, 87 Fed. Cl. at 393 (quoting *Systems Plus, Inc., v. United States*, 68 Fed. Cl. 206, 211 (2005); and *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 395-96 (1999) ("[C]onsistent with the simplified and flexible approach Part 8 takes toward [FSS] procurements, . . . the protestor will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations[] because no applicable procedural regulations are contained in [FAR] Part 8. A protestor instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision.")).

### 1. Price realism.

FTA's price realism evaluation of Harmonia's price quotation concluded that Harmonia's pricing was unrealistic, offering as an example Harmonia's stated approach to CLIN 2. There,

---

restrictions on protests set out in 10 U.S.C. § 2304c(d) and 41 U.S.C. § 4106(f), which are in like form, do not apply to task or delivery orders under GSA's Federal Supply Schedule Program)).

Harmonia proposed a number of labor hours that fell within [\*\*\*] of the FTA's Independent Government Cost Estimate ("IGCE"), but at a price that was [\*\*\*] below the IGCE.  AR 90-2636.  Due to this disparity, FTA concluded that "there is no way that [Harmonia] can sustain this over the four[-]year contract period."  *Id.*  Harmonia claims that this analysis is "replete with errors."  Pl.'s Mot. at 15.  Harmonia first argues that a numeric cutoff that "automatically renders the quotation unacceptable" if it departs from the IGCE by 16% or more is improper because FTA failed to take into account Harmonia's "unique approach."  *Id.* at 15-16 (citing *McConnell Jones Lanier & Murphy, LLP v. United States*, 128 Fed. Cl. 218, 239 (2016)).  And, Harmonia claims that because "[t]here is no evidence in the record that [FTA] considered the information that Harmonia provided in its quotation to substantiate its proposed pricing[,] . . . [FTA] did not meaningfully evaluate whether Harmonia can perform at the rates it proposed."  *Id.* at 16.

The record does not support Harmonia's claims.  The percentage departure from the IGCE was FTA's criterion for evaluating only the "Program Support Risk" metric and only "automatically" rendered the quotation unacceptable as to that metric.  *See* AR 90- 2636 to - 2638, 91-2642.  The price evaluation is explicit on this point; the record states that Harmonia's quotation was rejected because "most of the CLINs' prices were unrealistic *and* presented high risk to the government."  *See* AR 90-2638 (emphasis added).  This is further supported by the best-value-tradeoff analysis.  If the mere departure from the IGCE by more than 15% rendered a quotation unacceptable, FTA would have had no need to perform a tradeoff analysis as there would have been nothing between which to choose.  Additionally, the tradeoff itself does not merely reject Harmonia's quotation due to its variance from the IGCE but notes additional deficiencies.  *See* AR 91-2642 ("Harmonia['s] price proposal was unrealistically low, did not demonstrate a clear understanding of the requirements of all CLINs, was not inclusive of the required labor rates and categories, was not balanced correctly across CLINs, and did not support the level of expertise required for all CLINs . . . .").

Harmonia's further conclusion that FTA did not consider the information Harmonia provided and therefore did not meaningfully evaluate its quotation is also unconvincing.  Harmonia conflates *considering* Harmonia's claims that it could provide the requisite level of quality at its lower price point with an obligation to accept those claims as true.  The price evaluation evinces a familiarity with the information Harmonia provided but draws a different conclusion from that information.  In FTA's view, Harmonia's quotation "indicates that [Harmonia is not arriving at a lower cost by] providing efficiencies, but . . . [by] providing greater discounts for lower level personnel."  AR 90-2635 to -2636.  In support of this determination, FTA's price evaluation cites concerns about Harmonia's application of various labor categories.  *See* AR 90-2636 to -2637 (noting, among others, the use of the Webmaster II labor category for the Engineer III and II positions (or categories), the failure to include a "developer" labor category, and the lack of relevant experience for Admin III and Webmaster III positions).  Because FTA's conclusion is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is within FTA's sound discretion and permissible.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)).

Harmonia also objects to the use of the IGCE to measure realism, especially by way of the program-support-risk evaluation metric, a metric not included in the RFQ.  *See* Pl.'s Mot. at 15-16 & n.1.  Harmonia acknowledges that FTA did disclose its "general practice and risk mitigation strategy" of "deem[ing] a price proposal to be realistic if it falls within 15% of the

[IGCE]," but claims that a "statement of a 'general practice' d[oes] not put offerors on notice that exceeding 15% would automatically render the quotation unacceptable." *Id.* at 16 & n.1.

In addition to mischaracterizing the function of the program support-risk-evaluation metric, Harmonia also conflates program support risk with realism. As previously explained, the 16% cutoff renders a quotation unacceptable as to program support risk only; the general practice referenced by FTA regarding realism is not exclusive but inclusive, presuming a price quotation to be realistic if it is within 15% of the IGCE. *See* AR 79-2523. But even if FTA were using program support risk as a proxy for realism, it would be permissible in this case. "Unless the agency commits itself to a particular methodology in a solicitation, the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion . . . . The agency's discretion is even more pronounced when[, as here,] the [s]olicitation is silent regarding the methodology to be used in conducting a price realism analysis." *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 541 (2013) (internal citations, quotation marks, ellipses, and brackets omitted). In cases such as this, "an agency may perform a price realism analysis . . . [by] comparison of the prices received with each other; comparison of previously proposed prices for the same or similar items; [or] comparison with the IGCE." *Id.* at 542 (internal brackets omitted). It is within the exercise of FTA's sound discretion to determine its realism methodology, and comparing prices to the IGCE is one rational approach.[7]

### 2. *Balance.*

FTA's determination that the pricing in Harmonia's quotation was "not balanced with the level of effort listed in the [statement of work]," AR 90-2636, was based on the "high variance" in the labor hours proposed for CLINs 3, 5, and 9, *see* AR 90-2636; Def.'s Cross-Mot. at 32. Harmonia's proposed labor hours exceeded the IGCE hours for CLINs 3, 5, and 9 by more than 2,500 hours, 1,800 hours, and 4,600 hours respectively. AR 88-2621. Harmonia concedes that its pricing was unbalanced, *see* Pl.'s Mot. at 23 ("Indeed, the record shows that Harmonia's . . . estimates . . . exceeded the IGCE's . . . by thousands of hours."),  but argues that this "lack of balance was caused by the Agency's errors in conveying information about the requirement," Pl.'s Mot. at 22. As Harmonia sees it, when bids were initially solicited, FTA indicated that the antecedent contract supported 18 full-time equivalents, or 35,066 labor hours, and that the new contract would support similar levels of effort. *See* Pl.'s Mot. at 22. The Agency had provided estimated labor hours for CLINs 1, 2, 4, 6, 7, and 8, but not for CLINs 3, 5, and 9. *See* Pl.'s Mot. at 22-23. Harmonia used those estimates for its revised price quotation and determined that it could meet each of the CLIN requirements with 16.5 full-time equivalents, but to meet the "historical" estimate of 18 full-time equivalents, it "allocated the remainder of the total hours among [CLINs 3, 5, and 9], for which no estimate was made available." Pl.'s Mot. at 23. When

---

[7]Both OST and Harmonia proposed prices that were lower than the IGCE for most positions, but Harmonia's prices were nonetheless lower than OST's. Regarding the price differentials, the court inquired whether "the agency took into account the fact that Harmonia is based in Blacksburg[, Virginia, and not the metropolitan Washington area]." Hr'g Tr. 48:12-13. Counsel for the government responded that "[t]he GSA rate lists . . . apply no matter where–and there may be some distinction between onsite and offsite, but . . . my recollection . . . is that there was no separately set up price list for onsite and offsite." Hr'g Tr. 48:20 to 49:3.

FTA released its estimates, the IGCE had not estimated 18 full-time equivalents but 13.5.  Pl.'s Mot. at 23.  Harmonia concludes that "[t]hese errors by the Agency misled Harmonia to include far more overall [labor hours] than necessary, and to over-allocate [hours] to [CLINs 3, 5, and 9]. . . . [H]ad Harmonia known the total estimated [level of effort] was only 13.5 [full-time equivalents], it would have proposed . . . far fewer [labor] hours."  *See* Pl.'s Mot. at 24.

Harmonia's argument rests on a selective reading of the record.  First, in the very same paragraph in which the Agency explains that the antecedent contract supported 18 full-time equivalents, FTA was unequivocal that contractors need not propose that same level of effort: "[T]he [FTA] requires . . . contractor[s] to propose the [full-time equivalents] and labor mix . . . they [d]eem fit."  *See* AR 5-101.  Second, Harmonia fails to note that the suggestion that the level of effort required for the contract would be "similar" to 18 full-time equivalents referenced the base year of the contract, while the IGCE estimated 13.5 full time equivalents for option year one.  *Compare* AR 5-101 to -102 *with* Pl.'s Mot. at 23 (citing AR 88 "Excel tab 'IGCE Op Year 1,' row 29, Column J"); *see also* Def.'s Cross-Mot. at 33.  Harmonia's argument, then, that it would have proposed far fewer labor hours is unavailing.  FTA's solicitation sought the informed bids of industry practitioners; potential bidders were to demonstrate their expertise not by copying and pasting agency estimates or randomly allocating additional hours but by proposing the labor mix "they [d]eem[ed] fit."  AR 5-101.  "The offeror bears the burden of presenting an adequately written proposal that satisfies the requirements of the solicitation."  *Mercom, Inc. v. United States*, 131 Fed. Cl. 32, 40 (2017) (quoting *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 296 (2007) (internal quotation marks omitted)).  Failure to do so would hamper the procuring agency in its evaluation under the terms of the solicitation, as happened here.

Harmonia also argues that its unbalanced prices "should have no effect on the evaluation unless the Agency determines that the unbalanced pricing creates a risk of paying unreasonably high prices for contract performance," a risk Harmonia does not believe was present.  *See* Pl.'s Mot. at 24.  Prior decisional precedents do support the proposition that only "materially unbalanced bids," those that pose "an unacceptable risk to the government," are "enough . . . to cause the bid to be rejected."  *J & D Maint. & Servs. v. United States*, 45 Fed. Cl. 532, 536-37 (1999) (emphasis omitted).  But, "unreasonably high prices for contract performance" are not the only way in which unbalanced prices may create unacceptable risks for the government.  *Id.* at 537.  As is especially apparent in the context of FAR Subpart 8.4 and a best-value tradeoff, price is not the government's only concern. Of equal importance to the Agency's risk assessment is Harmonia's expertise and apparent understanding of the contract, both of which are undermined by unbalanced prices.  Additionally, even if the bid were not materially unbalanced, the imbalance was not the sole cause of the bid being rejected, but one of many factors considered in the best-value tradeoff.  *See* AR 91-2641 to -2642.  In sum, Harmonia was responsible for presenting the labor mix that, in its judgment, was the best fit for the contract, and FTA's rejection of that labor mix reflects nothing more than reasonable disagreement.

### 3.  *Inclusion of a deputy project manager.*

Harmonia's final critique of FTA's price quotation evaluation is that the Agency "criticized Harmonia for uncertainty" regarding the deputy project manager ("DPM") position.  Pl.'s Mot. at 25.  Under the inclusivity criterion, which evaluates whether a price quotation is "inclusive of all requested services," FTA took exception to Harmonia's price quotation for "not list[ing] the [DPM] in their overall labor category/rates chart in . . . the price proposal."  AR 90-

2634 to -2636.  Harmonia "did not provide a resume for the [DPM], and was missing information on the [DPM's] technical capabilities."  AR 90-2636.  Because Harmonia also failed to include a DPM position in its technical proposal, the Agency was "uncertain whether [Harmonia was] actually proposing a DPM or if [Harmonia was] simply listing a standard price. [Harmonia's] rate for [the] DPM [was] equal to the proposed rate for [the] [p]roject [m]anager, which is not a standard practice."  *See* AR 90-2636.  Harmonia claims that such criticism is arbitrary because "Harmonia did not address a DPM in its technical quotation or provide [additional information] . . . because a DPM was not required at the time . . . [the] technical quotations" were submitted.  Pl.'s Mot. at 25.  In Harmonia's view, the Agency waived any DPM requirements in a Q&A document issued on April 7, 2016.  *See* Pl.'s Mot. at 25-26 (citing AR 5-104).  And, even if a DPM position were required, Harmonia claims that it cannot be penalized for the failure to include one because it was notified of the requirement for the first time in July 2017, and it was not then given the opportunity to revise its technical proposal because it could only revise its price quotation.  *See* Pl.'s Mot. at 26.

Harmonia's arguments are not supported by the record.  While the Q&A document from April 2016 does state that "[t]he [d]eputy[-p]roject[-m]anager labor category has been removed," the context of the statement is relevant.  *See* AR 5-104.  That statement is the last sentence of an answer given to a question regarding key personnel.  *See* AR 5-104 ("On page 5 of the RFQ, 5 key personnel are identified, but when you review Factor B on page 58, it only lists one key person[]—[]Project Manager.  Just want to verify there [are] 5.").  The Agency's answer that the deputy-project-manager labor category had been removed referred to its removal as a *key* personnel position.  Three of the other bidders properly understood the statement and included a deputy-project-manager position in their solicitations.  *See* Def.'s Cross-Mot. at 37.  The government also expressed concerns because Harmonia charged the same rate for the deputy project manager and the project manager, even though the project manager had greater responsibilities and required more experience.  Harmonia also appears to have mechanically adopted the estimated labor hours disclosed by the Agency for the deputy project manager.  *See* Def.'s Mot. at 36, 38.  These concerns can reasonably be understood to undermine the Agency's confidence in Harmonia as a contractor.  It was therefore appropriate for the Agency to be uncertain about the inclusivity of Harmonia's price quotation and to penalize Harmonia for its failure to include a deputy-project-manager position in its technical quotation.

Taken as a whole, FTA's evaluation of Harmonia's price quotation was reasonable.

## B.  *FTA's Evaluation of Harmonia's Technical Proposal*

Harmonia raises a number of objections to FTA's evaluation of the technical proposals. *See* Pl.'s Mot. at 28-32.  In so doing, Harmonia invites the court to "deal with the minutiae of the procurement process in . . . [matters] which . . . involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal citations omitted).  Any "small errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."  *Grumman Data Systems Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir.1993)).

FTA assessed Harmonia a weakness as to criteria 38 and 39, which evaluated a contractor's "[d]emonstrated knowledge of and proficiency in full lifecycle management" by

"creating/maintaining a [t]est [p]lan" and "[t]est [r]eport for a specific custom application."  AR 89-2631, 3-73 to -74.  According to FTA, Harmonia failed to demonstrate this capacity as to a "specific custom application."  *See* AR 89-2631 (emphasis omitted).  Harmonia contends that it provided documentation that indicated that it includes and prepares test plans and test reports "for *all* of its clients," and insofar as it failed to "identify the *names* of the specific custom applications," it is being treated unequally because OST was at least equally unspecific.  *See* Pl.'s Mot. at 28-29 (emphasis in original).  But the record demonstrates that in addition to stating that it provides test plans and reports for all of its custom applications, OST listed "multiple customers" and applications for which it has provided these services.  AR 9-491 to -492.  FTA reasonably exercised its discretion in assessing Harmonia weaknesses for criteria 38 and 39 and did not treat the bidders unequally.

Harmonia was also assessed a weakness on criterion 55, which evaluated the ability of the personnel that its proposal assigned to CLIN 1 to "roll up five . . . or more concurrent projects."  *See* AR 89-2631 to -2632, 3-78.  While Harmonia did indicate that it "managed 25 active contracts," it "did not specify the . . . project['s] timing to demonstrate concurrence."  AR 89-2631.  It also failed to demonstrate that the proposed project manager had supported more than three clients or had the ability to "roll up" concurrent projects.  *See* AR 89-2631 to -2632; Def.'s Cross-Mot. at 40-41.  Harmonia objects to this analysis, claiming that the term "active" in its proposal could not be reasonably understood to mean anything other than concurrent and that nothing in the record required Harmonia to show that the relevant personnel, rather than Harmonia as the contractor, must demonstrate the ability to roll up five concurrent projects.  *See* Pl.'s Mot at 30.  Insofar as the Agency does require such a showing, Harmonia also argues that it was treated unequally because "OST's proposed [p]roject [m]anager had experience rolling up only *four* concurrent projects" but FTA credited OST for the criterion due to the OST's proposed deputy project manager who had experience "rolling up more than 20 distinct concurrent projects."  *See* Pl.'s Reply in Support of its Mot. for Judgment on the Administrative Record and Resp. to Def.'s and Def.-Intervenor's Mots. For Judgment on the Administrative Record ("Pl.'s Reply") at 16, ECF No. 29 (emphasis added).  Contrary to Harmonia's arguments, the record connotes that criterion 55 entails an evaluation of the "[q]ualifications of [p]roposed [p]ersonnel."  *See* AR 3-78 (heading).  As such, it was reasonable for FTA to assess Harmonia a weakness for not demonstrating its project manager's specific qualification to roll up concurrent projects.  It was equally reasonable for the FTA to treat OST's quotation differently from Harmonia's: OST included a deputy project manager while Harmonia did not, and the deputy project manager's role is to support the project manager.  It was therefore not unreasonable to consider the experience of OST's deputy project manager when determining the qualifications and capabilities of OST's proposed project manager.

Harmonia also contests FTA's assessment of a weakness for criterion 73.  Pl.'s Mot. at 30-31.  Criterion 73 addresses whether the proposed personnel have "experience generating development levels of effort based upon preliminary technical analysis efforts."  AR 3-81.  FTA assessed Harmonia a weakness for "not demonstrat[ing] that the development staff shows specific experience generating [levels of effort]" in the relevant personnel's resumes.  AR 89-2632.  Harmonia again claims that FTA acted arbitrarily because it "ignored aspects of Harmonia's proposal and treated [the] offerors unequally."  Pl.'s Mot. at 30.  The information said to be ignored was broad language that "over 100 of [Harmonia's] 300+ staff of developers have [the relevant] client experience."  Pl.'s Mot. at 31 (internal quotation marks omitted).  Harmonia claims that it was treated unequally because "OST [did] not provide any more

meaningful information" other than "naming the customers under which [OST's personnel] gained the required experience." Pl.'s Reply at 17-18. The record does not indicate that FTA ignored the relevant information in Harmonia's claim but rather illustrates that the Agency need not take Harmonia's unadorned word for its experience. As with criterion 55, it is reasonable for the Agency to eschew general language when it is evaluating the qualifications of specific personnel. It was also reasonable for FTA to reward OST for providing at least some information collaborating its claim of experience, which allowed FTA to follow-up on such claims, as was required by the solicitation. *See* AR 5-163 (requiring that all proposals "include convincing rationale and substantiation of all claims"). Harmonia was reasonably assessed a weakness under criterion 73.

Harmonia claims that it was assessed a weakness under criterion 79 for failure to meet "an unstated requirement." Pl.'s Mot. at 31. FTA assessed the weakness for failing to "demonstrate sufficient experience in development in SharePoint solutions for multiple customers . . . [because] no customers were listed for [the proposed personnel's] SharePoint experience." AR 89-2632. Harmonia argues that the requirements that the proposed personnel have experience working with "multiple" customers and that the proposal specifically name customers were nowhere in the solicitation and are therefore an arbitrary basis for assigning a weakness. *See* Pl.'s Mot. at 31-32. As explained in the discussion of criterion 73, a quotation's claims must be substantiated, so a requirement that such information, whether with names of customers or otherwise, be provided is not unstated but explicit in the solicitation. *See* AR 5-163. Additionally, Harmonia's quotation made the original claim that its personnel had "7+ years of experience in the development of SharePoint solutions for *multiple* customers." AR 7-333 (emphasis added). FTA's evaluation cited that statement, noting that Harmonia's particular claim had not been substantiated, but the weakness was reasonably assessed for failing to substantiate work with *any* customer, not due to Harmonia's failure to provide evidence of its own claims of working for multiple customers. *See* AR 89-2632.

FTA also assessed Harmonia a weakness under criterion 116 for failing to "demonstrate patch management or other activities to satisfy vulnerability remediation activities according to customer defined [service level agreements]." AR 89-2632. Harmonia contends that FTA's determination was arbitrary because Harmonia provided information that "described its experience . . . deploying security patches and testing those patches." *See* Pl.'s Mot. at 32. But the solicitation requires that such experience relate to required service level agreements, *see* AR 3-91; nothing in the responsive section of Harmonia's proposal makes that connection. *See* AR 7-337; Def.'s Reply in Support of Def.'s Cross-Mot. for Judgment on the Administrative Record ("Def.'s Reply") at 16, ECF No. 30. FTA reasonably assessed Harmonia a weakness as to criterion 116.

The final weakness challenged by Harmonia relates to criterion 127. *See* Pl.'s Mot. at 32-33. Criterion 127 requires quotations to "[d]emonstrate supporting application development . . . for fewer than 10 distinct custom applications." AR 3-93 (emphasis omitted). Harmonia claims that it was treated unequally because while both OST and Harmonia were assessed weaknesses for criterion 126, which had the same requirements as criterion 127 except that it required *more* than ten distinct custom applications, *see* AR 3-93, only Harmonia was assessed a weakness for criterion 127. *See* Pl.'s Mot. at 32. Because criterion 127 requires fewer than ten distinct applications, a proposal need only demonstrate that it has supported the development of some custom applications, which OST's did. *See* AR 9-474, -511; Def.'s Cross-Mot. at 44. Harmonia

also claims that if OST's *de minimus* showing was sufficient, it too should have been assessed a strength under criterion 127. *See* Pl.'s Reply at 21. But the responsive portion of Harmonia's quotation cites its personnel's experience supporting the [***] project while claiming to have led that same project elsewhere. *Compare* AR 7-327 to -328, 7-332, 7-337 *with* 7-333. Given the contradiction, it was reasonable for FTA to treat OST differently than Harmonia.

Whether considered criterion by criterion or taken as a whole, FTA's evaluation of Harmonia's technical proposal was reasonable.

### C. FTA's Acceptance of OST's Price Quotation

Harmonia contends that FTA improperly failed to reject OST's price quotation as ineligible for award. *See* Pl.'s Mot. at 33-35. OST's price quotation included various assumptions, such as, "[t]he [g]overnment will provide OST timely access to facilities required for the completion of the work aligned with this contract," and "[t]he [g]overnment will provide OST timely access to staff and [s]ubject [m]atter [e]xperts . . . required for the completion of the work assigned during this contract." *See* AR 9-585. Harmonia argues that such assumptions "take exception to the firm-fixed-price nature of the [proposal]," which "places the risk . . . [of work] exceed[ing] the estimated level of effort" on the contractor. Pl.'s Mot. at 33-34. Although the assumptions were not included in the terms of the awarded contract, Harmonia claims that they still reserve to OST "the right to a price adjustment any time it encounters [anything] . . . not specifically identified in the [statement of work]." *See* Pl.'s Reply at 23 (citing AR 9-585). Harmonia raised this issue in its GAO protest and GAO determined that it did not provide "a basis to sustain the protest." *See* AR 46-2197 & n.5.

Bid proposals must conform to the solicitation; "proposal[s] that fail[] to conform to the material terms and conditions of the solicitation [will not] be considered." *Centech Grp.*, 554 F.3d at 1038 (quoting *E.W. Bliss*, 77 F.3d at 448). Here, there is nothing in the record to support the assertion that OST's assumptions are anything more than an "illustrat[ion] that OST understood the [s]olicitation's requirements and the scope of the work." *See* Def.-Intervenor's Reply in Support of its Cross-Mot. for Judgment on the Administrative Record ("Def.-Intervenor's Reply"), at 15, ECF No. 31. Despite Harmonia's assertions to the contrary, none of OST's assumptions reserve, explicitly or implicitly, a right on OST's part to alter its pricing. *See* AR 9-585. Just as the firm-fixed-price solicitation requires, "OST agrees that it would bear the risk should the actual work deviate from the [g]overnment's estimate." Def.-Intervenor's Cross-Mot. for Judgment on the Administrative Record, Mem. in Support[,] and Response to Pl.'s Mot. for Judgment on the Administrative Record ("Def.-Intervenor's Cross-Mot.") at 26, ECF No. 26. OST's assumptions serve no function other than to provide a more complete picture of "how OST came up with its pricing." *See* Def.'s Cross-Mot. at 45-47; *see also* Def.-Intervenor's Cross-Mot. at 26; Def.-Intervenor's Reply at 15-16.

FTA reasonably determined that OST's assumptions did not take exception to the solicitation.

### D. FTA's Best-Value Determination

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss*, 77 F.3d at 449. FTA performed a best-value-

tradeoff evaluation and determined that OST, despite its relatively higher cost, provided the best value to the Agency. *See* AR 91-2641 to -2642. FTA summarized its assessment of Harmonia's proposal by stating: "[p]ut simply, the [e]valuation [t]eam could not be satisfied that Harmonia could perform the work required, at the price offered, to the satisfaction of the [g]overnment." AR 91-2642. Harmonia challenges as flawed FTA's determination on multiple grounds, *see* Pl.'s Mot. at 36-38, among them, that FTA improperly favored OST as an incumbent, Pl.'s Mot. at 37-38. The best-value-tradeoff evaluation states that OST, as "the incumbent . . . , possess[ed] intrinsic knowledge of the FTA programs, projects, and business practices, which represents a significant value and program efficiency to the FTA." AR 91-2611. Harmonia objects to this analysis, claiming it "represents [an] unstated evaluation criterion" and the problematic nature of this criterion is "exacerbated by the reality that OST is the incumbent only because the Agency made an improper award to OST in July 2016." Pl.'s Mot. at 37-38. That argument fails to grapple with the explicit criteria set forth in the solicitation. The record indicates that the Agency "reserve[d] the right to obtain information on [the bidders'] past performance from any sources." AR 3-64. It would border on unreasonable for FTA to *not* consider OST's past performance on the very project for which it is competing, absent the solicitation foreclosing such consideration, which it does not here.

Harmonia also argues that the tradeoff analysis was flawed because it "failed to even acknowledge Harmonia's price advantage." Pl.'s Mot. at 38. This is incorrect. The tradeoff evaluation noted that Harmonia's price quotation was "22% lower than the . . . IGCE" and that OST's quotation was "within 10% variance from the [IGCE]." AR 91-2641 to -2642. The juxtaposition of these two statements makes evident that Harmonia's quotation was the lower priced. Insofar as the Agency did not consider Harmonia's lower price a strength, that is because FTA was reasonably concerned that Harmonia's "price proposal was unrealistically low." *See* AR 91-2642; *see also supra* at 6-8.

Harmonia further argues that the tradeoff analysis was flawed because it evaluated Harmonia's proposal as containing "many significant weaknesses" while not referring to any of OST's weaknesses, even those accompanied by greater technical point penalties, as significant. *See* Pl.'s Mot. at 37. The government argues that "Harmonia wrongly supposes that a weakness's significance is measured strictly by its point value" rather than the relative importance of the weakness to effective performance of the contracted service. *See* Def.'s Cross-Mot. at 18-19. The Agency has broad discretion when making this best-value tradeoff. *See E.W. Bliss*, 77 F.3d at 448. It is not unreasonable for FTA to determine that an otherwise non-significant weakness could become significant in combination with others or that the degree to which a proposal fails to meet a requirement renders the weakness significant. In short, Harmonia has not met its "heavy burden of showing that" FTA "had no rational basis" for determining that Harmonia's weaknesses were significant while OST's were not. *See Centech Grp.*, 554 F.3d at 1037.

Harmonia's final argument against the best-value-tradeoff evaluation is that "[t]he numerous errors in the price and technical evaluations tainted the best[-]value decision." Pl.'s Mot. at 38. This has been resolved because the court has found both the price and technical evaluations to be reasonable. *See supra* at 10, 13. Therefore, FTA's best-value determination was reasonable.

## CONCLUSION

For the reasons stated above, the government's and OST's cross-motions for judgment on the administrative record are GRANTED, and Harmonia's motion for judgment on the administrative record is DENIED.  The clerk is directed to enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Judge